UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
-------------------------------------X
REGAN DUFNER,                                        Case No. 10CV-02027
                                                     (Arterton, J.)
                Plaintiff,

      -against-

ROBERT LAPRE, GEORGE ROBERTA,
GARY MONGERO, AWARD ENTERPRISES,
INC., AND NORTHEAST SORT AND
FULFILLMENT CORP.,

                Defendants.
-------------------------------------X


**EXHIBIT "A" TO MEMORANDUM OF LAW IN SUPPORT**

**OF DEFENDANTS' MOTION TO DISMISS**

**(AMENDED COMPLAINT)**


                              s/_____
                              PERRY DEAN FREEDMAN
                              (phv04472)
                              Attorney for Defendants
                              Roberta, Award Enterprises,
                              and Northeast
                              Ten Bank Street, Suite 650
                              White Plains, NY 10606
                              Tel.:914-289-0040
                              Fax: 914-289-0054
                              pdf@perryfreedmanlaw.com

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

----------------------------------------------------X

REGAN DUFNER,

        *Plaintiff,*                     Case No.  10-CV-02027 (JBA)

v.

ROBERT LAPRE, GEORGE ROBERTA,
GARY MONGERO, AWARD ENTERPRISES,
INC. AND NORTHEAST SORT AND
FULFILLMENT CORP.,

        *Defendants.*             May 2, 2011

----------------------------------------------------X

## AMENDED COMPLAINT

COMES NOW REGAN DUFNER (the "Plaintiff"), by and through its attorneys of record herein, who alleges as follows:

### JURISDICTION AND PARTIES

1.    Jurisdiction of the Count One is based upon 28 U.S.C. §1332 (Diversity).

2.    The Plaintiff is a Connecticut resident.

3.    Plaintiff is informed and believes, and thereon alleges that defendant Robert Lapre ("LaPre") is an individual resident of the State of New York.

4.    Plaintiff is informed and believes, and thereon alleges that defendant George Roberta ("Roberta") is an individual resident of the State of New York.

5.    Plaintiff is informed and believes and thereon alleges that defendant Gary Mongero ("Mongero"; and with LaPre and Mongero, are sometimes referred to herein collectively a the "Defendants") is an individual resident of the State of New York.

6.    Plaintiff is informed and believes and thereon alleges that defendant AWARD

     ENTERPRISES, INC. ("Award") is a New York corporation with its principal place of

     business in the State of New York.

7.    Plaintiff is informed and believes and thereon alleges that the defendant NORTHEAST

     SORT & FULFILLMENT CORP. ("NE") is a New York corporation with its principal

     place of business in the State of New York.

8.    Roberta is the principal owner, officer and director of Award.

9.    Roberta is the principal owner, officer and director of NE.

10.   The matter is controversy is in excess of $75,000.00

11.   Jurisdiction as to Count Seven is based on a Federal Question arising under 15 U.S.C. 78,

     *et seq.* for securities fraud as alleged more specifically in Count Seven.

12.   Jurisdiction as to the remaining Counts is pursuant to this Court's supplemental

     jurisdictional power under 28 U.S.C. §1337.

## VENUE

13.   Venue is proper under 28 U.S.C. §1391(a) in that the claims arise in this district; the

     original negotiations and agreements took place in the State of Connecticut and the

     written agreement between the parties names Connecticut as the appropriate venue for all

     actions.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

14.   At all times relevant hereto the Defendants acted in concert with one another as to each of

     the actions alleged herein.

15.   At all times relevant hereto the Defendants agreed to and conspired with one another to

     take the actions alleged herein.

16.   At all times relevant hereto the Defendants aided and abetted one another in the actions

     alleged herein.

17.     At all times relevant hereto the Defendants acted as the agent of one another, and acted in the course and scope of said agency in the actions alleged herein.

18.     Plaintiff is informed and believe and allege that at all relevant times herein there existed a unity of interest and ownership between the Roberta and Award such that any individuality ceased to exist, in that, *inter alia*: (a) Roberta used Award's assets as his own and for the benefit of the other defendants; (b) Roberta dominated and controlled the Award and intermingled funds and assets with other affiliated and controlled entities for his own benefit, convenience, and to avoid payment and performance of obligations to third parties, and for the benefit of the other defendants; © Roberta used Award and other entities as mere shells, instrumentalities and conduits for his own personal gain and use, and to perpetrate the frauds herein alleged with the other defendants.

19.     Roberta's conduct deems adherence to the corporate fiction and the separate existence of Roberta and Award an injustice to Plaintiff.

20.     Plaintiff is informed and believe and allege that at all relevant times herein there existed a unity of interest and ownership between the Roberta and NE such that any individuality ceased to exist, in that, *inter alia*: (a) Roberta used NE's assets as his own and for the benefit of the other defendants; (b) Roberta dominated and controlled the NE and intermingled funds and assets with other affiliated and controlled entities for his own benefit, convenience, and to avoid payment and performance of obligations to third parties, and for the benefit of the other defendants; © Roberta used NE and other entities as mere shells, instrumentalities and conduits for his own personal gain and use, and to perpetrate the frauds herein alleged with the other defendants.

21.     Roberta's conduct deems adherence to the corporate fiction and the separate existence of Roberta and NE an injustice to Plaintiff.

22.     In or about July 7, 2010, Plaintiff and Mongero formed partnership and became equal general partners in the general partnership known as G&R Partners (the "Partnership Agreement").

23.     The partnership was formed for the purpose of purchasing, leasing and operating a restaurant known as Blackboard Bistro, located at 166 Stonleigh Avenue Carmel, New York (a true and correct copy of the Partnership Agreement is attached hereto as Exhibit A; the terms and conditions of the partnership agreement are incorporated by this reference as though set forth in full hereat).

24.     Award owns the real estate located at 166 Stonleigh Avene, Town of Carmel, County of Westchester, State of New York.

25.     Roberta has caused NE to be the tenant of Award at the subject property.

26.     In or about July 7, 2010, Plaintiff and Mongero and/or the partnership contracted to purchase the stock of NE from Roberta, and to guarantee certain obligations to Roberta and Award (the "Purchase Contract")  (a true and correct copy of the Purchase Agreement is attached hereto as Exhibit B; the terms and conditions of the Purchase agreement are incorporated by this reference as though set forth in full hereat).

27.     As a material inducement to entering into the Purchase Contract, Roberta made certain material misrepresentations to Plaintiff regarding, inter alia, the value of the purchase and leasehold, the liquor, and financing of the purchase.

28.     As a material inducement to entering into the Purchase Contract, Roberta omitted to make certain material representations to Plaintiff, regarding, inter alia, the value of the purchase and leasehold and prior transactions.

29.     Plaintiff relied upon the material representations and omissions of Roberta in entering into the Purchase Contract, and in his further negotiations with Mongero, Lapre and other third parties concerning property.

30. Roberta's representations were false statements of fact.

31. Roberta knew that the representations when made were untrue.

32. Roberta made the statements and omitted others to induce Plaintiff to rely on the representations and omissions and enter into the Purchase Contract and other various agreements regarding the property.

33. As a material inducement to entering into the Partnership Agreement and Purchase Contract, Mongero made certain material misrepresentations and omissions to Plaintiff , including, inter alia, the property, capital contributions, liabilities, term, the liquor license and operation of the business.

34. Mongero's representations were false statements of fact.

35. Mongero new the representations when made were untrue.

36. Mongero made the statements to induce Plaintiff to rely on the representations omissions and enter into the Purchase Contract, the Partnership Agreement and other various agreements regarding the property.

37. Plaintiff relied upon the material representations and omissions of Mongero to his detriment in entering into the Purchase Agreement, Partnership Agreement and in his further negotiations with Roberta, Lapre and other third parties concerning the property.

38. As a material inducement to entering into various agreements to perform construction work at the Premises, LaPre made certain material misrepresentations to Plaintiff, including, *inter alia*, improvements, costs of improvements, billing, and repayment.

39. Dufner relied to his detriment on the material representations and omissions of LaPre in entering into the construction contracts and in his further negotiations with Mongero, Roberta and other third parties concerning the property.

40. LePre representations and omissions were false statements of fact

41. LePre knew the representations when made were untrue.

42. LePre made the statements to induce Plaintiff to rely on the representations and enter into the various construction contracts and other various agreements regarding the property

43. Lapre caused certain companies owned and controlled by him to perform work at the property and became a creditors of the partnership and NE, contrary to the agreement, and in part to force Plaintiff's removal from the property and partnership.

44. In violation of the agreements, LaPre never presented any invoices or bills to Plaintiff or the partnership.

45. At some point in time in or around September 5, 2010, Mongero, Lapre and/or Roberta, jointly and severally, and each of them, coerced, strongarmed and blackmailed Plaintiff into no longer participating in the restaurant project or the partnership.

46. At some point in time after September 5, 2010, Mongero requested that the partnership be terminated and Plaintiff be replaced as a partner with Lapre without any compensation or consideration to Plaintiff.

47. From and after September 5, 2010, with tacit and implicit knowledge and consent of Roberta, Mongero and LaPre have operated the restaurant under the fictitious business name of Blackboard Bistro Restaurant and have excluded Plaintiff from the business opportunity.

48. From and after September 5, 2010, Mongero engaged in a pattern of bouncing partnership checks and intentionally creating additional liability to Plaintiff.

49. From and after September 5, 2010, Mongero fail and/or refused to pay certain legitimate creditors of the partnership with whom Plaintiff had a prior relationship in an effort to damage Plaintiff and said creditors.

## COUNT I - BREACH OF CONTRACT

50. Plaintiff realleges paragraphs 1 through 49 inclusive and incorporates each and every allegation as though set forth in full hereat.

51. Plaintiff has fully performed his obligations under the various contracts by and among the Plaintiff and Defendants, except for those obligations excused by the Defendants' collective and individual conduct.

52. Defendants, and each of them, have breached the oral and written agreements between Defendants and Plaintiff.

53. Plaintiff has suffered damages in excess of $75,000.00 as a direct and proximate result of Defendants' conduct, which sum shall be proven at trial.

### COUNT TWO -NEGLIGENT MISREPRESENTATION

54. Plaintiff realleges paragraphs 1 through 53, inclusive, and incorporates each and every allegation as though set forth in full hereat.

55. As a direct and proximate cause the representations made by Defendants, and each of them, Plaintiff has suffered damages in excess of $75,000.00.

### COUNT THREE -NEGLIGENT MISREPRESENTATION

56. Plaintiff realleges paragraphs 1 through 55, inclusive, and incorporates each and every allegation as though set forth in full hereat.

57. As a direct and proximate cause the representations made by Defendants, and each of them, Plaintiff has suffered damages in excess of $75,000.00.

### COUNT FOUR -FRAUD

58. Plaintiff realleges paragraphs 1 through 57, inclusive, and incorporates each and every allegation as though set forth in full hereat.

59. As a direct and proximate cause the representations made by Defendants, and each of them, Plaintiff has suffered damages in excess of $75,000.00.

### COUNT FIVE - TORTIOUS INTERFERENCE WITH BUSINESS OPPORTUNITY

60. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through and including 59 set forth above as though set forth in full hereat.

61. A business relationship existed between Plaintiff, Mongero, Roberta and LePre.

62. Defendants, and each of them, intentionally and materially interfered with the business relationship and opportunity of Plaintiff in and to the ownership and operation of the property and related transactions.

63. As a direct and proximate result thereof such interference, Plaintiff has suffered damages in excess of $75,000.00.

## COUNT SIX - DECLARATORY RELIEF

64. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 to and and including 63 set forth above as though set forth in full hereat.

65. A material dispute over the ownership and rights, duties and obligations of the parties under the various agreements has arisen.

66. As a direct and proximate result thereof, Plaintiff has suffered damages in excess of $75,000.00.

## COUNT SEVEN - UNJUST ENRICHMENT

67. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through and including 66 set forth above as though set forth in full hereat.

68. Defendants, and each of them, received the benefit of Plaintiff's development of the business, goods and services.

69. Defendants', and each of them, have been unjustly enriched by the goods and services provided by Plaintiff.

70. The failure of Defendants', and each of them, to pay for such goods and services has harmed Plaintiff.

71. As a direct and proximate cause of such failure, Plaintiff has suffered damages in excess of $75,000.00.

Page -8-

## COUNT EIGHT - PROMISSORY ESTOPPEL -DETRIMENTAL RELIANCE

72.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through and including 71 set forth above as though set forth in full hereat.

73.     As a material inducement to continue to provide funds and services to Defendants and each of them, Defendants, jointly and severally, and each of them, represented and assured Plaintiff of the value and preservation of his interest in the restaurant property and business.

74.     In detrimental reliance of said representations and assurances, Plaintiff continued to provide funds and services to the Defendants, and each of them.

75.     As a direct and proximate result thereof, Plaintiff has suffered damages in excess of $75,000.

## COUNT NINE - SECURITIES FRAUD

76.     Plaintiff repeats and realleges paragraphs 1 through 75 inclusive and incorporated each and every allegation as though set forth in full hereat.

77.     During a series of meetings between in or about July 7, 2010, between Plaintiff, Mongero and Roberta, Roberta made false and misleading statements to Plaintiff by (1) stating that the value of stock was materially and substantial greater than it was, (2) that the value of leasehold estate was materially and substantially greater than it was, (3) omitting to state to Plaintiff that Roberta had entered into prior similar transactions resulting the buyers/lessees going out of business and Roberta gaining the value of improvements to the property and (4) omitting to inform Plaintiff that such prior transactions we nearly identical to the proposes transaction.

78.     Roberta, as owner of the property and the owner of the Stock in NE, was interested in selling the stock of NE as the highest possible price.

79.  Roberta had the opportunity to communicate the misleading statements to Plaintiff during the parties' negotiations regarding the Purchase Contract and leasing of the property.

80.  Roberta failed to convey specific information to the Plaintiff regarding the value of the stock and why such stock might be worth significantly less than advertised, especially such information regarding similar prior transactions.

81.  Robert's statements and omissions were made to induce Plaintiff to enter into the Purchase Contract for the stock and Roberta knew that Plaintiff would rely on the same in making investment decisions.

82.  Plaintiff relied on such misstatements to his detriment buy purchasing the stock, which was worth substantially less Roberta claimed.

83.  LePre and Mongero were active participants in the convincing Plaintiff to invest in the stock and made similar representations regarding the stock during meetings with on another on or July 7, 2010.

84.  The representation and omissions of Defendants were made with the intent of inducing Plaintiffs to invest the monies and efforts set forth above as to the restaurant.

85.  The scheme of investments as set forth above was actually promoted to Plaintiffs by Defendants and constitutes a "security" as defined by 15 U.S.C. Section 78C(c)(10).

86.  Defendants, and each of them, were the issuers of such securities as defined by 15 U.S.C. Section 78C(a)(8).

87.  In engaging in the foregoing acts Defendants, with the knowledge, and assistance of each other employed a manipulative or deceptive device or contrivance in connection with the sale of a security in contravention of Rule 10(b-5) as promulgated by the Securities and Exchange Commission.

88.  As a direct and proximate result thereof, Plaintiff has suffered damages in excess of $75,000.

### COUNT TEN

### AS TO DEFENDANT ROBERTA ONLY

### SECURITIES VIOLATION - BREACH OF FIDUCIARY DUTY

89. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 88 above with the same force and effect as though set forth herein.

90. Plaintiff was Roberta had a relationship and Roberta had a duty to Plaintiff.

91. The relationship was characterized by a unique degree of trust and confidence as Roberta was the owner of the property and stock and Plaintiff relied on Roberta's knowledge and experience in entering into the transaction.

92. Roberta's misrepresentations and actions underlying the entire project has resulted in a breach Roberta's fiduciary duty to Plaintiff.

93. As a direct and proximate result thereof of Roberta's Breach of fiduciary duty, Plaintiff has suffered damages in excess of $75,000.

### COUNT ELEVEN - ACCOUNTING

94. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 93 above with the same force and effect as though set forth herein.

95. Plaintiff prays for an accounting of any and all funds paid, received or applied for his benefit or liability from any Defendant herein.

### COUNT TWELVE - AS TO LEPRE AND ROBERTA ONLY - CUTPA C.G.S. §41-110(a)

96. The Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 95 above with the same force and effect as though set forth herein.

97. At all relevant times herein Roberta was engaged in trade or commence by way the leasing and sale of various property.

98. Plaintiff purchased stock and lease property from Roberta as a result of Roberta being engaged in such trade and commerce.

99.     At all relevant times herein LePre was engaged in trade or commence by way of providing construction goods and services.

100.    The partnership and Plaintiff purchased construction goods and services from LePre as a result of LePre being engaged in such trade or commerce.

101.    The acts, omissions and trade practices of Defendants are unfair and deceptive as defined in the Connecticut Unfair Trade Practices Act, Section 41-110(a) of the Connecticut General Statutes, and constitute a violation thereof.

102.    In addition, substantial aggravating factors exist that surround Roberta's and LePre's breaches and violations, including: (1) Roberta's fraud and misrepresentations and LePre's fraud and misrepresentations, (2) the number of, repeated nature of, the breaches and violations and (3) Plaintiff's prospective expose to liability in connection with the transactions.

103.    As a result of such violations and breaches, Plaintiffs have been damaged in the amount of $850,000.

**WHEREFORE**, Plaintiff prays:

       A.    For actual damages in excess of the amount of $75,000.00, according to proof;

       B.    Cost of suit;

       C.    Attorneys' fees;

       D.    Interest at the maximum legal rate;

       E.    Punitive Damages under C.G.S. §41-110(a);

       F.    Disgorgement of all amounts paid to or on behalf of any Defendant;  and

       G.    For each other and further relief as the Court deems just and proper.

DATED:      May 2, 2011 at Norwalk, Connecticut.

               **THE PLAINTIFF**

By:   _____
             Mark Stern, Esq.
             Mark Stern & Associates, LLC
             PO BOX 2129
             16 River Street
             Norwalk, Connecticut 06852-2129
             (203) 853-2222
             Federal Bar No. CT01701

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------X
REGAN DUFNER,

        *Plaintiff,*                Case No.  10-CV-02027 (JBA)

v.

ROBERT LAPRE, GEORGE ROBERTA,
GARY MONGERO, AWARD ENTERPRISES,
INC. AND NORTHEAST SORT AND
FULFILLMENT CORP.,

        *Defendants.*           May 2, 2011
-------------------------------------------------------X

## **DEMAND FOR JURY TRIAL**

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand

a jury trial of the within action.

DATED:      May 2, 2011
                Norwalk, Connecticut

                          **THE PLAINTIFF**

By:   _____
                          Mark Stern, Esq.
                          Mark Stern & Associates, LLC
                          PO BOX 2129
                          16 River Street
                          Norwalk, Connecticut 06852-2129
                          (203) 853-2222
                          Federal Bar No. CT01701

## PARTNERSHIP AGREEMENT

This PARTNERSHIP AGREEMENT is made on __July 7__ , 20__10__ between __Regan Dufner__ and __Gary Monsell__ .

1. **NAME AND BUSINESS**. The parties hereby form a partnership under the name of __G + R Partnership__ _____ to conduct a __restaurant purpose__ . The principal office of the business shall be in _____ .

2. **TERM**. The partnership shall begin on __July 7__ , 20__10__ , and shall continue until terminated as herein provided.

3. **CAPITAL**. The capital of the partnership shall be contributed in cash by the partners as follows: A separate capital account shall be maintained for each partner. Neither partner shall withdraw any part of his capital account. Upon the demand of either partner, the capital accounts of the partners shall be maintained at all times in the proportions in which the partners share in the profits and losses of the partnership.

4. **PROFIT AND LOSS**. The net profits of the partnership shall be divided equally between the partners and the net losses shall be borne equally by them. A separate income account shall be maintained for each partner. Partnership profits and losses shall be charged or credited to the separate income account of each partner. If a partner has no credit balance in his income account, losses shall be charged to his capital account.

5. **SALARIES AND DRAWINGS**. Neither partner shall receive any salary for services rendered to the partnership. Each partner may, from time to time, withdraw the credit balance in his income account.

6. **INTEREST**. No interest shall be paid on the initial contributions to the capital of the partnership or on any subsequent contributions of capital.

7. **MANAGEMENT DUTIES AND RESTRICTIONS**. The partners shall have equal rights in the management of the partnership business, and each partner shall devote his entire time to the conduct of the business. Without the consent of the other partner neither partner shall on behalf of the partnership borrow or lend money, or make, deliver, or accept any commercial paper, or execute any mortgage, security agreement, bond, or lease, or purchase or contract to purchase, or sell or contract to sell any property for or of the partnership other than the type of property bought and sold in the regular course of its business.

8. **BANKING**. All funds of the partnership shall be deposited in its name in such checking account or accounts as shall be designated by the partners. All withdrawals are to be made upon checks signed by either partner.

9. **BOOKS**. The partnership books shall be maintained at the principal office of the partnership, and each partner shall at all times have access thereto. The books shall be kept on a fiscal year basis, commencing __July 7 2010__ and ending __Dec 31 2010__ , and shall be closed and balanced at the end of each fiscal year. An audit shall be made as of the closing date.

10. **VOLUNTARY TERMINATION**. The partnership may be dissolved at any time by agreement of the partners, in which event the partners shall proceed with reasonable promptness to liquidate the business of the partnership. The partnership name shall be sold with the other assets of the business. The assets of the partnership business shall be used and distributed in the following order: (a) to pay or provide for the payment of all partnership liabilities and liquidating expenses and obligations; (b) to equalize the income accounts of the partners; (c) to discharge the balance of the income accounts of the partners; (d) to equalize the capital accounts of the partners; and (e) to discharge the balance of the capital accounts of the partners.

11. **DEATH**. Upon the death of either partner, the surviving partner shall have the right either to purchase the interest of the decedent in the partnership or to terminate and liquidate the partnership business. If the surviving partner elects to purchase the decedent's interest, he shall serve notice in writing of such election, within three months after the death of the decedent, upon the executor or administrator of the decedent, or, if at the time of such election no legal representative has been appointed, upon any one of the known legal heirs of the decedent at the last-known address of such heir. (a) If the surviving partner elects to purchase the interest of the decedent in the partnership, the purchase price shall be equal to the decedent's capital account as at the date of his death plus the decedent's income account as at the end of the prior fiscal year, increased by his share of partnership profits or decreased by his share of partnership losses for the period from the beginning of the fiscal year in which his death occurred until the end of the calendar month in which his death occurred, and decreased by withdrawals charged to his income account during such period. No allowance shall be made for goodwill, trade name, patents, or other intangible assets, except as those assets have

EXHIBIT A

been reflected on the partnership books immediately prior to the decedent's death; but the survivor shall nevertheless be entitled to use the trade name of the partnership. (b) Except as herein otherwise stated, the procedure as to liquidation and distribution of the assets of the partnership business shall be the same as stated in paragraph 10 with reference to voluntary termination.

12. **ARBITRATION**. Any controversy or claim arising out of or relating to this Agreement, or the breach hereof, shall be settled by arbitration in accordance with the rules, then obtaining, of the American Arbitration Association, and judgment upon the award rendered may be entered in any court having jurisdiction thereof.

Executed this ____7____ day of __July__ , 20 6 in __Carmel__ [city], ____NY____ [state].

## STOCK PURCHASE AGREEMENT

AGREEMENT dated as of June _____, 2010, by and among REGAN DUFNER and GARY MONGERO with addresses at 34 Stevens Street, Stoneham, Massachusetts 02180 (Morgero) and 18 Old Musket Lane, Danbury, CT 06810 (Dufner), hereinafter referred to as the "Buyers"; GEORGE ROBERTA, with an address at 229 McLain Street, Mt. Kisco, New York 10549, hereinafter referred to as the "Seller"; and NORTHEAST SORT & FULFILLMENT CORP. with offices at 229 McLain Street, Mt. Kisco, New York 10549, hereinafter referred to as the "Corporation."

Seller owns Common Shares representing all of the shares of the Corporation. Seller desires to sell to Buyers, and Buyers desire to purchase from Seller all Seller's shares (the "Shares") upon the terms and subject to the conditions herein set forth.

Accordingly, the parties hereto, intending to be legally bound hereby agree as follows:

SECTION 1. Sale and Purchase of Shares .Upon the terms and subject to the conditions herein set forth, Seller hereby sells, assigns, transfers and delivers to Buyers, and Buyers hereby purchase from Seller, Seller's Shares free and clear of all liens, encumbrances, mortgages, charges, security interests, equities, options and pledges of every kind and interest (collectively, "Claims"). Actual transfer of stock will unequivocally coincide with the change of the tax year from 2010 to 2011, and occur on

January 1, 2011. Seller will be responsible for the 2010 tax filings and Buyers will be responsible for 2011 and forward.

SECTION 2. Consideration and Payment; Closing Documents.

(a)     Purchase Price. In exchange for the aforesaid Shares: Buyers shall pay the amount of $49,000.00 in the following manner: $25,000.00 cash at closing; $24,000.00 promissory note, 0% interest, payments of $500.00 per month for ~~five (5)~~ four (4) years. A copy of the promissory note is annexed hereto as Exhibit "A."

It ~~is understood and agreed that the Seller's Shares shall~~ be held in escrow pursuant to the Escrow Agreement attached hereto until said payments are made. It is also understood and agreed that the Corporation shall not be dissolved and shall continue to do business under the existing corporate name until such time that all debts personally ~~guaranteed by Seller have been satisfied.~~

(b)     Delivery and Certificates. Seller shall deliver to Buyers and Buyers will acknowledge the receipt of a certificate or certificates for Seller's Shares owned by such Seller duly endorsed to Buyers or with stock powers attached fully executed to Buyers, in proper form for transfer, and with stamps for all applicable Federal, State or Local stock transfer taxes, if In any event any "transfer tax" shall be oblig to Buyer any, affixed thereto. ^The ~~stocks shall, however, be held in escrow pursuant~~ to ~~the Escrow Agreement attached~~ hereto.

SECTION 3. Representations and Warranties of Seller with Respect to the Seller. The Seller, for himself individually hereby represents and warrants to buyer as follows:

(a) Title to Shares. Seller is the lawful owner of all of the Shares registered on the books of the corporation in Seller's name. The delivery of certificates for such Shares, together with related stock powers, to Buyers pursuant to the provisions of this Agreement will transfer to Buyers good and marketable title thereto, free and clear of all claims.

(b) Authority of Seller. Seller has full right, power and authority to sell, assign, transfer and deliver to Buyers the Shares which they are selling pursuant thereto. This Agreement has been fully executed and delivered by Seller or the duly appointed attorney-in-fact of such Seller and this Agreement constitutes the legal, valid and binding obligation of such Seller enforceable in accordance with its terms except as enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting enforcement of creditors' rights generally and except as enforcement hereof is subject to general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law). The execution, delivery and performance of this Agreement by Seller will not violate any material provision of any laws to which such Seller is subject. The performance of this Agreement and the consummation of the transactions by Seller of any of the terms or provisions of, or constitute a default by Seller under any trust (constructive or other), lease, or other agreement or instrument to which such Seller is a party with the

exception of the mortgage currently on the subject property. Seller is not a party to, or subject to, or bound by, any judgment, injunction, order or decree of any court or governmental authority or any arbitration award which may materially restrict or interfere with the performance by Seller of this Agreement or such other documents which may be executed or delivered by Seller in connection herewith.

(c)     No Bankruptcy, etc. There has not been filed any petition or application, or any proceeding commenced, by or against, or with respect to assets of Seller under Title 11 of the United States Code or any other law, domestic or foreign, relating to bankruptcy, reorganization, compromise, arrangement, insolvency, readjustment of debt or creditors' rights, and Seller has not made any assignment for the benefit of creditors.

(d)     Legal Proceedings. There is no action, suit, proceeding or investigation pending (or, to the knowledge of Seller, threatened) affecting the right of Seller to sell the Shares pursuant to this Agreement or otherwise to carry out the provisions of this Agreement and the transactions contemplated hereby, in any court, at law or in equity, or before or by any Federal, State, local or other governmental department, commission, board bureau, agency or instrumentality, domestic or foreign, or before any arbitrator of any kind.

SECTION 4. Representations and Warranties of Seller with Respect to the Company. Seller represents and warrants to Buyer as follows:

(a)  Authorized Capital Stock.  The authorized capital-stock of the Company consists of the following: Common Shares, no par value, all of which have been validly issued, and are outstanding, fully paid and non-assessable.  There do not exist any warrants, options or other rights outstanding for the issue or purchase of shares of capital stock or other securities of the Company, any securities convertible into or exchangeable for shares of capital stock or other securities of the Company, or any plans, contracts or commitments providing for the issuance of or granting of rights to acquire, any capital stock of the Company or securities convertible into or exchangeable for capital stock of the Company, which Seller is selling to Buyer.

SECTION 5.  Representations and Warranties of Buyer.  Buyers represent and warrant to Seller as follows:

(a)  Organization and Corporate Power.  Buyers have the necessary power and authority to execute, deliver and perform this Agreement.  This Agreement has been duly authorized, executed and delivered by Buyers and constitutes the legal, valid and binding obligation of Buyers, enforceable in accordance with its terms except as enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting enforcement of creditors' rights generally and except as enforcement hereof is subject to general principles or equity (regardless of whether enforcement is considered in a proceeding in equity or at law). The execution, delivery and performance of this Agreement by Buyers will not violate any material provision of law or any judgment,

decree or order of any court or other governmental agency to which Buyers are subject, or conflict with, or result in any breach of, any of the terms, conditions or provisions of, or constitute a default (or an event which with the giving of notice or lapse of time, or both, would become a default) under, or result in the creation of any Claim upon any of the properties or assets of Buyers pursuant to, any indenture, mortgage, trust (constructive or otherwise), lease, loan agreement, credit agreement or any other agreement or properties is or may be bound or affected.

### SECTION 6. Further Agreements.

(a)    Governmental Filings.    Seller and Buyers shall cooperate with each other, and Seller shall cause the Company to cooperate, in filing any necessary applications, reports or other documents with any Federal or State agencies, authorities, including the New York State Liquor Authority, or bodies (domestic or foreign) having jurisdiction with respect to the sale of the Shares of this Agreement, and in seeking

necessary consultation with and prompt favorable action by any such agencies, authorities or bodies.

SECTION 7.    Conditions to Obligations of Buyers.    All obligations of Buyers under this Agreement are, subject to the conditions that, at the date hereof:

(a)    Consent and Agreement.    Concurrently with the execution and delivery of this Agreement, the Company shall have

executed the Consent and Agreement attached as Exhibit "A" [Consent and Agreement] hereto acknowledging its agreement to do or cause to be done all things necessary or desirable to effect--the purposes and intent of this Agreement.

(b)     Delivery by Seller.  Seller shall have tendered to Buyers the certificates for Seller's Shares to be sold by Seller as provided herein.

SECTION 9.     Expenses.     Whether or not the transactions contemplated by this Agreement shall be consummated, the parties agree to pay all their own expenses, including without limitation all reasonable accounting, appraisal and legal fees incurred by or on behalf of Buyer and Seller with respect to this Agreement and the transactions contemplated hereby.

SECTION 10. Certain Understandings. Except as provided in Section 11, none of the representations, warranties or covenants contained in this Agreement shall survive the Closing of the purchase and sale of the Shares. Buyers acknowledge that it and its representatives have had full and complete access to the books and records, facilities, equipment, tax returns, contracts, insurance policies, inventories, and other assets of the Company, which it and its representatives have desired or requested to see and/or review, and that it and its representatives have had a full opportunity and access to all the records maintained by the Corporation. Buyer further acknowledges that, except as expressly provided in this Agreement, neither Seller nor the Company or any other person has made any representation of warranty, expressed or implied, as to the accuracy or

completeness of any information regarding the Company not included in this Agreement or the Exhibits thereto, and neither the Seller, the Company or any other person will have or be subject to any liability to Buyers or any other person resulting from the distribution to Buyers, or Buyers' use of, any such information. Buyers also acknowledge that Buyers have had sufficient opportunity to make whatever investigation it shall deem necessary and advisable for purposes of determining whether its conditions to the closing of the purchase and sale of the Shares shall have been satisfied. However, all parties agree that Buyers have relied on the representations made by Seller in Paragraph 3 of this Agreement. Furthermore, all parties agree the assets of Northeast Sort & Fulfillment Corp. include only propane (~$700.00), a liquor license, lease with Award Enterprises, some alcohol and any goodwill.

### SECTION 11. Indemnification.

(a)    Indemnification of Seller.    In exchange for the shares, Buyers agree to indemnify and hold Seller harmless against and will reimburse Seller for any damages, claims, losses and reasonable expenses (including without limitation, reasonable attorneys' fees and disbursements) incurred by Seller (collectively, "Damages") occurring at any time after the sale of the Stock Certificates.

(b)    Indemnification of Buyer.    Any claim for Damages incurred by Buyers arising out of the breach of any representation, warranty or agreement of Seller set forth in this Agreement shall be indemnified by Seller, including all applicable tax indebtedness.    To secure Seller

indemnification of Buyers herein, Seller represents that he is the sole officer, director, and shareholder of Award Enterprises, Inc. and shall pledge the stock of this corporation, as well to indemnify the Buyers herein for any losses incurred by Buyers based on any misrepresentations of Seller in this Agreement.

(c)     Conditions of Indemnification.    If any claim of liability shall be asserted against Buyers or the Company, which (if successfully prosecuted) would give rise to a claim by Buyers against Seller for breach of any representation, warranty, or agreement made by Seller in this Agreement, Buyer shall promptly, upon learning of such claim, promptly notify Seller in writing of the assertion of such claim. In case notice of any such claim shall be to give to Seller, Seller shall be entitled, at Seller's own expense, to participate in the defense of such claim. In the event any such claim shall be asserted against Buyer or the Company, Buyer agrees to contest, or cause the Company to contest, such claim in good faith in a commercially reasonable manner (without regard to the indemnification obligations of Seller).

(d)     Within six (6) months after closing, Seller agrees to provide to Buyers' attorney proof that Seller has paid all applicable taxes. In the event that such proof is not received by Buyers' attorney within six (6) months, then Buyers shall make all future note payments to Buyers' attorney, William A. Shilling, Jr., Esq., 105 Gleneida Avenue, Carmel, New York 10512, who shall hold such sums in escrow until such time as Buyers' attorney has received the documentation required to be delivered to Buyers'

attorney pursuant to this paragraph. Upon receipt by Buyers' attorney of said proof of payment, Buyers' attorney may release the escrow money to Seller.

SECTION 12. Miscellaneous.

(a)    Successors and Assigns.    The rights and obligations of Seller under this Agreement shall not be assignable by such Seller/Buyer without the prior written consent of Buyer/Seller.    The rights and obligations of Buyer/Seller under this Agreement shall not be assignable by Buyer/Seller without the prior written consent of Seller/Buyer.    Nothing herein expressed or implied is intended to confer upon any person, other than the parties hereto or their respective permitted assignees, successors, heirs and legal representative, any right, remedies, obligations or liabilities under or by reason of this Agreement.

(b)    Extensions. Waivers and Amendments.    Seller and Buyer may, by written agreement, (i) except for the January 1, 2011 transfer of stock, which must occur without exception, extend the time for the performance of any of the obligations or other acts of the parties hereto, (ii) correct inaccuracies in the representations and warranties contained in this Agreement or in any documents delivered pursuant to this Agreement, (iii) waive compliance with or modify any of the agreements contained in this Agreement, and (iv) waive or modify performance of any of the obligations of any of the parties to this Agreement.

(c)     Notices.     Any notice, request or other document to be given hereunder to any party shall be effective upon receipt (or refusal of receipt) and shall be in writing and delivered personally or sent by telex, telecopy or certified or registered mail, postage prepaid:

(i) if to Seller, address to:

George Roberta
229 McLain Street
Mt. Kisco, New York 10549

(ii) if to Buyer, addressed to:

William A. Shilling, Jr., Esq.
105 Gleneida Avenue
Carmel, New York 10512

or to such other address as any party shall have specified by notice given to the other party in the manner specified above.

(d)     Entire Agreement.     This Agreement, including the Exhibits thereto, and the other agreements expressly contemplated by this Agreement contain the entire agreement between Buyer and Seller with respect to the transactions contemplated hereby and supersedes all prior oral and written agreements, memoranda, understandings and undertakings between the parties hereto relating to the subject matter hereof.

(e)     Governing Law.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to the application of its conflicts of laws principles.

(f)     Severability.     In case any provision in this Agreement

shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

(g)     Construction. The section and subsection headings used herein are for convenience of reference only, are not a part of this Agreement and are not to affect the construction of, or be taken into consideration in interpreting, any provision of this Agreement. As used in this Agreement, the singular includes the plural and the masculine, feminine and neuter gender each includes the other, unless the context otherwise dictates.

(h)     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(i)     Consent to Jurisdiction. Seller, by Seller's execution of this Agreement, and Buyer (i) irrevocably understand and agree that each of the Seller, the Buyer, the Company, their respective successors or assigns, may bring any suit, action or legal proceeding arising out of this Agreement or any of the transactions contemplated hereby in the courts of the State of New York or, with respect to claims arising under Federal law, the United States District Court of New York, (ii) irrevocably consent to the jurisdiction of each such court in any suit, action or legal proceeding, and (iii) irrevocably waive any objection it may have to the laying of the venue of any suit, action or legal proceeding in any such courts.

(j)    Removal of Personalty.  Seller shall have thirty (30) days from date of closing to remove all personalty owned by him from the premises.

(k)    Material.  In consideration of the proceeds generated from the material yard, Seller shall be entitled to all fittings and pipes.

_____          _____
GEORGE ROBERTA, SELLER                      REGAN DURNER,          BUYER

                                            _____
                                            GARY MONGERO,          BUYER

Guarantor:

AWARDS ENTERPRISES, INC.

_____
GEORGE ROBERTA, President
Awards Enterprises, Inc.

## EXHIBIT "A"

# NOTE

**$17,000.00**

**Carmel, New York**

**June , 2010**

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay to the order of **GEORGE ROBERTA** with an address of 229 McLain Street, Mt. Kisco, New York 10549 (hereinafter referred to as Lender) **TWENTY FOUR THOUSAND DOLLARS AND NO CENTS ($24,000.00)** (this amount will be called "PRINCIPAL"), plus interest. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder".

### 2. INTEREST

Four (4)

I will pay interest at a rate of **ZERO (0%)** percent per year amortized over ~~FIVE (5)~~ years. ~~Interest will be charged on that part of principal which has not been paid. Interest will be charged beginning on the date of this Note and continuing until the full amount of principal has been paid.~~

I will pay principal ~~and interest~~ by making payments every month. Each of my monthly payments will be in the amount of **FIVE HUNDR ED DOLLARS AND NO CENTS ($500.00)**.

### 3. TIME AND PLACE OF PAYMENTS

I will pay principal ~~and interest~~ by making payments every month.

I will make my monthly payments on the first day of each month beginning on **July 1, 2010.**

### USE THIS LANGUAGE IF NOT A BALLOON

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal.

Upon making the final (48th) payment (a total of $24,000.00), all the equipment listed on Rider 1 of the Commercial Property Lease shall be purchased by George Roberta, from Award Enterprises, Inc., and given to borrowers, free and clear of any liens or encumbrances.

This Note will be secured by the gross sales of the restaurant.

$14500

George Roberta Agrees to make an additional ~~$10,000.00~~ credit line available, at a rate of ½% per month or any portion thereof, subject to a maximum rate allowed by law. all monies due refund in this credit line shall be due and payable in 24 months

USE THIS LANGUAGE IF BALLOON - I will make these payments every month until
~~at which time a balloon payment will become due and I will pay~~
~~off the remaining balance of the loan together with any other charges, described below, that I~~
~~may owe under this Note.~~

## 4. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any of my monthly payments by the
end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder.
The amount of the charge will be 2 percent of my overdue payment of principal and interest.

(B) Default

If I do not pay the overdue amount by the date that the next monthly payment is due, I will be
in default. If I am in default, the Note Holder may require me to pay immediately the full
amount of principal which has not been paid and all the interest that I owe on the amount.

Even if, at a time when I am in default, the Note Holder does not require me to pay
immediately in full as described above, the Note Holder will still have the right to do so if, at
a later time, I am in default again.

(C) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note
Holder will have the right to be paid back for all of its reasonable costs and expenses. Those
expenses include, for example, reasonable attorney's fees, etc.

## 5. BORROWER'S PAYMENTS BEFORE THEY ARE DUE

Borrower's Right to Make Prepayments

I have the right to make payments of principal before they are due. Any payment made
before it is due is known as a "prepayment". A prepayment of only part of the unpaid
principal balance is known as a "partial prepayment". **I may make a full prepayment or
partial prepayment without paying any prepayment charge and/or penalty.**

If I choose to make a partial prepayment, the Note Holder may require me to make the
prepayment on the same day that one of my monthly payments is due. The Note Holder may
also require that the amount of my partial prepayment be equal to the amount of principal that
would have been part of my next one or more monthly payments. If I make a partial
prepayment, there will be no delays in the due dates or changes in the amounts of my
monthly payments unless the Note Holder agrees in writing to those delays or changes. The
Note Holder will use all of my prepayments to reduce the amount of principal that I owe
under this Note.

## 6. BORROWER'S WAIVERS

I waive my rights to require the Note Holder to do certain things. Those things are: (A) to
demand payment of amounts due (known as "presentment"); (B) to give notice that amounts
due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification
of nonpayment (known as a "protest"). Anyone else (i) who agrees to keep the promises
made in this Note, or (ii) who agrees to make payments to the Note Holder if I fail to keep

my promises under this Note, or (iii) who signs this Note to transfer it to someone else (known as "guarantors, sureties, and endorsers"), also waives these rights.

## ~~7. THIS NOTE COVERED BY A MORTGAGE~~

~~A Mortgage dated ———————, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Mortgage describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.~~

## 8. RESPONSIBILITY OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety or endorser of this Note (as described in Section 6 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

REGAN DUFNER

GARY MONGIRO

## EXHIBIT "B"

## CONSENT AND AGREEMENT

NORTHEAST SORT & FULFILLMENT CORP., a New York Corporation (the "Corporation"), hereby acknowledges the intent and purposes of that certain Stock Purchase Agreement dated as of June        , 2010, (the "Agreement") and hereby consents and agrees, to the extent within its legal power, to do or cause to be done all things and to execute or cause to be executed such documents as may be necessary to be executed to effect the provisions, purposes and intent of the Agreement. Without limiting the generality of the foregoing, the Corporation hereby expressly agrees to comply with and be bound by Section 6(a), and Section 9 of the Agreement.

This Consent and Agreement shall be binding on the Corporation and its successors and assigns.

IN WITNESS WHEREOF, intending to be legally bound hereby, the Corporation has executed this Consent and Agreement this _____ day of June, 2010.

NORTHEAST SORT & FULFILLMENT CORP.

By: _____

President